**UNITED STATES of America,
Appellee,**

v.

**Lawrence X. CUSACK, Defendant–
Appellant.**

**No. 99–1564.**

United States Court of Appeals,
Second Circuit.

Argued July 13, 2000

Decided Oct. 13, 2000

Peter G. Neiman, Assistant United States Attorney, Mary Jo White, United States Attorney for the Southern District of New York (Baruch Weiss, on the brief), New York, N.Y., for Appellee.

Maranda E. Fritz, Fritz & Miller, New York, N.Y., for Defendant–Appellant.

Before: WALKER, Chief Judge, and POOLER and SOTOMAYOR, Circuit Judges.

PER CURIAM:

Lawrence X. Cusack appeals from a judgment of conviction entered on September 24, 1999, in the United States District Court for the Southern District of New York (Denise L. Cote, *District Judge*). He was convicted of various counts of mail fraud, in violation of 18 U.S.C. §§ 1341 & 1342, and various counts of wire fraud in violation of 18 U.S.C. § 1343. He was sentenced to 115 months' imprisonment, three years' supervised release, and restitution in the amount of $7,000,000.

## FACTS

This case arises out of Cusack's sale of hundreds of forged documents falsely attributed to President John F. Kennedy, and pertaining to highly sensitive personal matters, some of which were fabricated.

In 1992, Cusack, then a paralegal in his late father's law firm, befriended John Reznikoff, a dealer in historical memorabilia. In the course of their conversations, Reznikoff told Cusack that Kennedy memorabilia was in great demand and commanded high prices. Approximately one year later, Cusack told Reznikoff that he had found certain Kennedy documents among his father's papers. Cusack provided Reznikoff with several examples of such documents, the contents of which purported to describe, among other things, President Kennedy's relationship with Marilyn Monroe, a secret prior marriage, and an investigation into a Kennedy tax fraud scheme.

Cusack explained to Reznikoff that his father, a prominent New York attorney, had formerly represented the New York Archdiocese of the Catholic Church (the "Archdiocese"), and that the Archdiocese had arranged for Cusack's father secretly to represent President Kennedy in certain personal matters. In fact, Cusack's father's firm had provided legal services to the Archdiocese, but that is where the truth stopped. Cusack invented his father's relationship with President Kennedy to lend credibility to his "discovery" of the bogus Kennedy papers.

Cusack provided further corroboration for the documents' authenticity by producing genuine deeds showing land transfers from members of the Kennedy family to the New York Archdiocese. Cusack falsely claimed to have found the deeds with the bogus Kennedy documents among his father's papers, thus buttressing the claim of his father's alleged relationship with the Kennedys. Evidence at trial established that, through his position as a paralegal, Cusack had gained unsupervised access to the Archdiocese's vault from where he had stolen the deeds. To bolster his personal credibility, Cusack further invented a distinguished military career for himself and, on several occasions, he wore military insignia and uniforms in Reznikoff's presence.

While Reznikoff believed the forged documents to be genuine, based in part on his understanding of Cusack's personal and family history, he told Cusack that the

documents would need to be independently authenticated before they could be sold. Reznikoff met with several experts in the field who authenticated the documents, also relying on Cusack's explanation—related through Reznikoff—of the documents' discovery. Eventually, Reznikoff contacted Tom Cloud, a leading document dealer, who accepted the documents' authenticity and then took the lead in selling them to his clients. Through Cloud, Cusack sold over 250 of the fraudulent Kennedy documents for more than $6,000,000.

In 1996, Cusack's scheme began to unravel when several journalists began to work on a story about the purported Kennedy documents. First, they uncovered Cusack's lies about his military service. Then, in 1997, forensic document examiners determined that the typewriters used to produce certain of the documents did not exist during President Kennedy's lifetime. On August 22, 1997, ABC News Anchorman Peter Jennings interviewed Cusack and confronted him with the forensic evidence.

Immediately following the interview, Cusack called Reznikoff and told him about the Jennings interview. At a meeting shortly thereafter, Cusack confessed to Reznikoff that he had lied about his military career and that he had forged all of the documents. He signed a statement that Reznikoff had not participated in the fraud. However, shortly after the meeting, Cusack called Reznikoff and retracted his confession. He said that he had falsely confessed to protect the reputation of his deceased father who, Cusack now claimed, was the actual forger. According to Cusack, he had been duped along with everyone else. Cusack maintained this defense at trial. The jury, however, rejected it and Cusack now appeals from his conviction and sentence.

## DISCUSSION

On appeal, Cusack argues that: (1) the district court erred by admitting prejudicial evidence concerning (a) Cusack's lies about a military career, and (b) his enormous personal expenditures; (2) the district court abused its discretion by denying Cusack's request for a continuance to enable his handwriting expert to prepare for trial; and (3) the district court improperly departed upward from the Sentencing Guidelines. We disagree.

■ At trial, the government elicited detailed testimony concerning Cusack's fabricated military career. Cusack objected, arguing that the evidence should be excluded under Fed.R.Evid. 403 as more prejudicial than probative. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The district court held that the evidence was "highly probative" and admitted it with accompanying instructions to the jury concerning its proper use.

The district court gave similar limiting instructions both when the evidence was originally admitted, and again in the middle of the government's summation after the government referred to Cusack's bogus military career. In the latter instance, the district court instructed:

As you know, the government has offered evidence that it alleges shows that the defendant had falsely described certain things about his own background and his father's background. The government has argued that this evidence is related to the crimes with which the defendant is charged ... and this is the proper use of it, that this evidence reflects an effort by the defendant to induce reliance on his statements about the documents at issue in this case and helps to explain why others relied on his statements about the documents, that is, that it was part of the method, according to the government's theory of the case, in which the defendant committed the crimes with which he is charged.

If you find that the defendant misrepresented his own background or his father's background, you may not consider

such evidence as proof that the defendant has a criminal personality or bad character. That is not a proper use of that evidence. Again, such evidence about misrepresentations about his own life or his father's life would be admitted and received and considered by you for much more limited purposes, the purposes I have described.

"A district judge's Rule 403 analysis is reversible error only when it is a clear abuse of discretion." *United States v. Salameh*, 152 F.3d 88, 122 (2d Cir.1998), *cert. denied sub nom. Abouhalima v. United States*, 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). We agree with the government that the evidence was properly admitted as evidence of the fraudulent scheme and to rebut the defense that Cusack did not know the documents were forged. Cusack lied about his military background in order to bolster his own credibility and to further the fraud. This evidence was also probative of Cusack's knowledge that the documents were forged and of his purpose in committing the fraud. *See United States v. Lamont*, 565 F.2d 212, 215 (2d Cir.1977) ("[I]t is a general principle of law that whenever a fraudulent intention is to be established, collateral facts tending to show such intention are admissible proof.") (internal quotation marks omitted). It tended to rebut, in other words, any claim by Cusack that he was simply a pawn in someone else's fraud scheme. The evidence also was not unduly prejudicial in the context of the audacious fraud with which Cusack was charged. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1961, 146 L.Ed.2d 793 (2000) (upholding admission of evidence that "did not involve conduct more inflammatory than the charged crime"); *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990) (same). In light of its careful limiting instructions, the district court did not abuse its discretion by admitting the probative evidence of Cusack's invented military career.

■ The district court also permitted the government to introduce evidence concerning the extravagant manner in which Cusack spent the money he received through the sale of the forged documents. The district court found that the evidence was "classic motive evidence." On appeal, Cusack points primarily to *United States v. Ewings*, 936 F.2d 903 (7th Cir.1991), to argue that evidence of lavish spending should not be admissible to show motive. Although such evidence was ultimately admitted in that case as evidence of the defendant's participation in an insurance fraud scheme, the Seventh Circuit was nevertheless "reluctant to subscribe to the government's theory that criminal intent may be inferred from the items on [defendant's] shopping list." *Ewings*, 936 F.2d at 906.

■ We need not address the admissibility of this evidence, however, because any error in admitting it was harmless in this case. To determine if an error is harmless, "we consider principally whether the government's case against the defendant was strong, whether the evidence in question bears on an issue that is plainly critical to the jury's decision ... whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury, and whether the case was close." *United States v. Jean–Baptiste*, 166 F.3d 102, 108–09 (2d Cir. 1999) (internal quotation marks and citations omitted). Unlike in *Jean–Baptiste*, here all of the enunciated factors tend to demonstrate that the evidence was harmless. The government introduced very little evidence of Cusack's lavish spending. The evidence pertained to an ancillary issue in a lengthy trial at which substantial other evidence of guilt was presented, and the government did not emphasize it in opening or summation. If error at all, permitting the introduction of this evidence was harmless.

■ Cusack next argues that the district court erred by denying his motion for

a continuance to allow an additional handwriting expert, Robert Phillips, to prepare for his trial testimony. In the middle of trial, Cusack announced for the first time that he intended to call Phillips. But before Phillips was able to complete his handwriting analysis, he suffered an eye injury. Cusack then moved unsuccessfully for a continuance of two to three weeks to permit Phillips to recover and complete his analysis.

■ A district court has broad discretion to grant or deny a motion for a continuance. *See United States v. Pascarella*, 84 F.3d 61, 68 (2d Cir.1996). Because Cusack did not announce his intention to call Phillips until after the start of trial, and the content of Phillips' testimony was not known, the district court did not abuse its discretion by denying the continuance. *See United States v. Beverly*, 5 F.3d 633, 641 (2d Cir.1993) ("To demonstrate an abuse of this discretion, a defendant must demonstrate arbitrary action that substantially impaired the defense.").

Finally, Cusack argues that the district court improperly departed from the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") by imposing a two-level enhancement for abuse of trust, *see* U.S.S.G. § 3B1.3, and a two-level enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1. We disagree.

■ Section 3B1.3 prescribes a two-level enhancement "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." The enhancement generally applies to defendants who hold positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, Application Note 1. While we have held that this discretion "must be entrusted to the defendant by the victim," *United States v. Moskowitz*, 215 F.3d 265, 272 (2d Cir.2000) (quoting *United States v. Broder-*

*son*, 67 F.3d 452, 456 (2d Cir.1995)), the victim whose trust the defendant abused need not have been the primary victim of the fraud, *see United States v. Barrett*, 178 F.3d 643, 647 (2d Cir.1999) (distinguishing between primary and secondary victims of fraud). "[T]he definition of victim depends upon the circumstances of the case. We must examine the relationship that existed between the defendant and victim and whether it provided defendant the ability to commit the crime." *Id.*

The basis for the § 3B1.3 enhancement was Cusack's theft of the authentic Kennedy deeds from the vault of the Archdiocese. By falsely claiming that he had found these deeds among his father's papers, Cusack enhanced the appearance of authenticity of the forged documents. While this is not the paradigmatic case of abuse of trust, we believe that the ingredients for applying the enhancement are sufficiently present.

The district court properly found that Cusack, as a representative of the Archdiocese's law firm, held a position of trust with respect to the Archdiocese because he was given unsupervised access to a vault in which sensitive deeds and documents were stored. *See United States v. Allen*, 201 F.3d 163, 166 (2d Cir.2000) ("Applicability of a § 3B1.3 enhancement turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong.") (internal quotation marks omitted).

In addition, the Archdiocese was plainly a secondary victim of Cusack's crime. Its legal documents were stolen in furtherance of the scheme. Moreover, as the district court found, certain of the documents forged by Cusack falsely implicated the Archdiocese in President Kennedy's purported intrigues, as they "depicted prominent figures in the Catholic Church as facilitators" of these intrigues, thereby "plac[ing] the Archdiocese in an extremely unfavorable light." Taken as a whole, the facts in this case are sufficient to sustain an enhancement for abuse of trust.

350

■ The record also adequately supports the district court's § 3C1.1 obstruction of justice enhancement upon its finding that Cusack intentionally disguised his handwriting in exemplars that he provided to the government. *See United States v. Valdez*, 16 F.3d 1324, 1335 (2d Cir.1994).

We have considered Cusack's remaining arguments and find them to be without merit. For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.