**Nancy MIRACLE, aka Nancy Greene, Nancy Green, Nancy Maniscalco, Plaintiff,**

v.

**The NEW YORKER MAGAZINE, Defendant.**

No. 99 CV 00689.

United States District Court, D. Hawaii.

July 9, 2001.

Gary Victor Dubin, Honolulu, HI, for plaintiff.

Nancy Miracle, Honolulu, HI, pro se.

James J. Bickerton, Bickerton, Saunders & Dang, Honolulu, HI, Kevin W. Goering, Coudert Brothers, New York City, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

KING, District Judge.

### BACKGROUND

Plaintiff Nancy Miracle ("Miracle") brings this action against Defendant *The New Yorker* Magazine ("*The New Yorker*") for defamation and related tort claims. *The New Yorker* is a well-known magazine published nationwide in the United States by The Conde Nast Publications, Inc., a New York corporation with its principal place of business in New York. Miracle is a resident of Hawaii. This Court has diversity jurisdiction over the instant action.

Miracle was born Nancy Maniscalco on September 14, 1946. She became Nancy Greene upon her marriage to Fred Greene; they eventually divorced. Following the divorce, Miracle retained the name "Greene" until 1990 or 1991, when she changed her name to Nancy Miracle.

Her new name, Miracle explains, was in honor of a miraculous discovery she had made about her identity: She is the daughter of famed Hollywood actress Marilyn Monroe ("Monroe"). According to Miracle, Monroe left her in someone else's care in order to pursue a film career in Hollywood.

Miracle claims that she first learned of her true identity in 1985, when she was about 39 years old. One day, a writer named John Bilillo, whom she had met through a mutual friend, told her that she was Monroe's daughter. Miracle remembers her reaction as such: " 'Yeah,' you know, when you hear the truth.... There was no need to explain. It was just the truth, and when the truth happens, it just—my head reeled, and it made all the sense in the world, yeah." Miracle Depo. at 85–86. Prior to her discovery, Miracle was not under the belief that Monroe was her real mother. Alerted to her newfound heritage, Miracle attempted to confirm the fact with other members of her family.[1]

Miracle's claim to be Monroe's daughter intersects with this case by way of an article by David Samuels entitled "Fakes: Who Forged the J.F.K.–Marilyn Monroe Papers?" published in the November 3, 1997, issue of *The New Yorker*. The article primarily concerned Lawrence ("Lex") Cusack III, who was selling documents that he represented as substantiation of an extramarital affair between President John F. Kennedy and Monroe. The documents were supposedly found in the files of Lex's father, Lawrence Cusack, an attorney whose clients included a number of prominent members of the Catholic church

who had secretly handled sensitive legal matters for President Kennedy. The documents were discovered to be forgeries, and Cusack was convicted of mail and wire fraud in connection with the creation and sale of forged documents. *See United States v. Cusack*, 229 F.3d 344 (2d Cir. 2000) (affirming Cusack's conviction).

According to the article, it was a meeting between Lex and Miracle that gave Lex the idea for his scheme. The article recounts that in early 1986, "a dishevelled woman in her early forties" appeared in the offices of Cusack & Stiles, where Lex was working as a paralegal. Exh. "A" to Def.'s Mot. (the "Article") at 62.[2] The woman, Nancy Greene (i.e., Miracle), asked to see Lawrence X. Cusack, Lex's father. Since Lawrence Cusack had passed away, Miracle was taken to see Lex. The article states that "Nancy Greene laid out a tangled claim to the Monroe estate, and Lex Cusack quickly concluded that she was nuts." *Id.* Nonetheless, the meeting had piqued Lex's curiosity. A search through his father's files led Lex to discover documents purportedly evidencing the Monroe–Kennedy affair. The remainder of the article details Lex's efforts to peddle the documents.

This defamation suit followed.[3] Although Miracle takes issue with the content and tone of the article as a whole, her complaint identifies several specific statements within the article as false and defamatory:

1. that Miracle was "dishevelled" and "in her early forties";

---

1. Miracle's grandmother, Nellie Sanfilippo Cusumano, smiled and nodded when Miracle asked her, "Gram, am I Marilyn Monroe's daughter?" Miracle Depo. at 87–88. The other family with whom Miracle shared the news, her uncle Joey Cusumano, advised a visit with a psychiatrist. *Id.* at 264.

2. The pagination corresponds to that of the original article, not that of the exhibit.

3. Miracle filed her complaint pro se. She has since retained counsel.

2. that Miracle "laid out a tangled claim to the Monroe estate";

3. that Miracle "was nuts";

4. that Gladys Baker, Monroe's mother, passed away in 1986;

5. that "[a]nother note was later found suggesting that Nancy Green might be a code name for Marilyn Monroe";

6. that "[l]ike novelists, forgers inhabit their characters in order to convince. They can't help leaving traces of themselves behind";

7. that "[t]he forger had to start somewhere ....";

8. that Monroe "blackmailed J.F.K. into creating another, similar trust, telling him that if he didn't she would reveal his ties to the Mob"; and

9. an advertisement at the end of the article for the television program "Washington Week in Review," showing a picture of $100 dollar bills hung on a clothesline to dry, with the slogan underneath reading, "If you launder it, is it still dirty?"

*See* Compl. ¶¶ 8–10, 12–14. Miracle asserts claims for (1) libel per se, (2) defamation, (3) tortious infliction of emotional distress, (4) tortious interference with contractual relations and business, (5) unjust enrichment, and (6) punitive damages.

Before the Court is *The New Yorker's* motion for judgment on the pleadings, or in the alternative, for summary judgment.

### LEGAL STANDARDS

Judgment on the pleadings is appropriate if the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and it is entitled to judgment as a matter of law. *General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir.1989); Fed.R.Civ.P. 12(c). All allegations of fact by the party opposing the motion are accepted as true and are construed in the light most favorable to that party. *Seventh–Day Adventists*, 887 F.2d at 230. If matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(c).

The issues raised by the instant motion require an examination into matters outside the pleadings, which the Court does not exclude. The parties have had an opportunity to conduct discovery. The record before the Court demonstrates that the case can be disposed of without requiring the resolution of any issue of material fact. Accordingly, this case is appropriate for summary adjudication.

Miracle submits that if the Court were to treat the motion as one for summary judgment, it should delay ruling to allow further discovery pursuant to Rule 56(f). Under that rule, a party opposing a motion for summary judgment must demonstrate that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition ...." According to Miracle, further discovery is needed to respond to *The New Yorker's* arguments regarding the substantial truth defense and the fault of *The New Yorker*. Because the Court does not need to reach these issues, it denies a continuance pursuant to Rule 56(f).

### DISCUSSION

#### I. DEFAMATION

Counts I and II seek recovery for libel per se and defamation, respectively. Since libel is a category of defamation, the Court analyzes Counts I and II together. *See Roemer v. Commissioner of Internal Rev.,*

716 F.2d 693, 699 (9th Cir.1983) (treating libel and slander as different types of defamation actions).

### A. Applicable Law

 Before considering the merits of the defamation claims, the Court must first decide whether the claims are governed by the law of New York or Hawaii. A federal court sitting in diversity must apply the conflict of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir.2000). Hawaii applies the most significant relationship test propounded in the Restatement (Second) of Conflicts of Laws. *Roxas v. Marcos*, 89 Hawai'i 91, 117 n. 16, 969 P.2d 1209, 1235 n. 16 (1998); *Lewis v. Lewis*, 69 Haw. 497, 499, 748 P.2d 1362, 1365 (1988); *Peters v. Peters*, 63 Haw. 653, 634 P.2d 586 (1981); Restatement (2d) Conflicts of Laws § 145 (1971). Under this test, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties. . . ." Restatement (2d) Conflicts of Laws § 145(1). Factors relevant to the application of the most significant relationship test include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *Id.* § 145(2). In regards to claims involving defamatory statements published in multi-

ple states, these factors normally call for application of the law of the plaintiff's domicil, for it is there that the plaintiff can be said to enjoy a reputation, and there that such reputation would suffer by the accused writing. *Hanley v. Tribune Publ'g Co.*, 527 F.2d 68, 70 (9th Cir.1975); Restatement (2d) Conflict of Laws § 150(2) & cmt. e.[4] Here, Hawaii is where Miracle is domiciled. Accordingly, Hawaii's law of defamation applies.

### B. Legal Framework

 Under Hawaii law, a plaintiff must establish four elements to state a claim for defamation: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher and actual malice where the plaintiff is a public figure; and (d) either actionability of the statement respective of special harm or the existence of special harm caused by the publication. *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996). The threshold question is whether the statements at issue are defamatory in nature. "Pure opinions"—opinions that do not imply facts capable of being proved true or false—are protected by the First Amendment, and are not actionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.1990). At minimum, a statement must express or imply a verifiably false fact about the plaintiff. *Milkovich*, 497 U.S. at 19–20, 110 S.Ct. 2695. Hawaii has adopted the Ninth Circuit's three-part

**4.** Comment e to Restatement (Second) of Conflicts of Law § 150 reads in part:

Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states of an aggregate communication claimed to be defamatory, at least most

issues involving the tort should be determined ... by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation. This will usually be the state of the plaintiff's domicil if the matter complained of has there been published.

test for determining whether a statement constitutes non-actionable opinion or an assertion of objective fact: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Gold v. Harrison*, 88 Hawai'i 94, 101, 962 P.2d 353, 360 (1998) (quoting *Fasi v. Gannett Co., Inc.*, 930 F.Supp. 1403, 1409 (D.Haw.1995)); *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995). Whether a statement is an opinion is a question of law. *Partington*, 56 F.3d at 1156.

▮▮▮▮ Moreover, even if a statement falls outside the category of "pure opinion," it must be reasonably susceptible of a defamatory meaning to be actionable. *Gold v. Harrison*, 88 Hawai'i 94, 101, 962 P.2d 353, 360 (1998) (citing *Fernandes v. Tenbruggencate*, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)). A statement has defamatory meaning when it tends to "harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." *Fernandes*, 65 Haw. at 228, 649 P.2d at 1147 (quoting Restatement (Second) of Torts § 559 (1976)). The test for defamatory meaning is an objective one. *Howard v. Daiichiya–Love's Bakery, Inc.*, 714 F.Supp. 1108, 1114 (D.Haw.1989). If the court finds that the statements are not reasonably susceptible of the defamatory meaning ascribed to it by the plaintiff, the defamation claim should not be put before the trier of fact. *Fernandes*, 65 Haw. at 228 n. 1, 649 P.2d at 1147 n. 1 (citing Restatement (Second) of Torts § 614 cmt. b).

▮▮▮▮ Finally, a plaintiff must demonstrate that the statements at issue were of or concerning the plaintiff. A plaintiff cannot support a claim of defamation by showing that a statement defamed third persons. *See Rose v. Indianapolis Newspapers, Inc.*, 213 F.2d 227, 230 (7th Cir. 1954); *Gilbert Shoe Co. v. Rumpf Pub. Co.*, 112 F.Supp. 228, 229 (D.Mass.1953); *Davis v. Costa–Gavras*, 619 F.Supp. 1372, 1376 (S.D.N.Y.1985).

Miracle's claim of defamation is at once general and specific. She complains of the general taint of the article—that it puts her in the company of forgers, liars, and otherwise unscrupulous types, and that, therefore, others would be dissuaded from dealing with her after reading the article. Miracle's complaint also identifies specific statements in the article that she takes to be defamatory. The Court therefore examines the article as a whole as well as the discrete statements alleged to be defamatory.

### C. *The General Tenor of the Article*

▮▮▮▮ Hawaii law recognizes that in defamation suits, "the law does not dwell on isolated passages, but judges of the publication as a whole." *Fernandes*, 65 Haw. at 230, 649 P.2d at 1148 (internal quotation marks omitted) (quoting *Kahanamoku v. Advertiser Publ'g Co., Ltd.*, 25 Haw. 701, 714 (1920)). Where an allegedly defamatory article relates to one subject, all that is said on the subject must be considered in order to determine the sense in which the article would be rationally understood by those reading it. *Id.* at 230–31, 649 P.2d at 1148. Notwithstanding these principles, a gestalt approach to analyzing defamatory meaning does not work to Miracle's favor. All that is said in the article about Miracle amounts to little in the overall scheme of the story. The article is not about her at all. Her significance in the article is limited to being the person who triggered Lex's interest in his father's business. The discovery of his father's

files—and the ensuing scheme to pass them off as the Monroe–J.F.K. papers—is all Lex's doing, explains the article, and it is that tale which the article aims to tell. The article assigns no culpability whatsoever to Miracle. No reasonable factfinder applying all due effort could strain from the article the guilt by association that Miracle perceives.

### D. *"Dishevelled" and "Early forties"*

 Miracle contends that the article's description of her as "dishevelled" and in her "early forties" is libelous. The "dishevelled" comment cannot be taken as an assertion of objective fact. It is the author's subjective description of Miracle's physical appearance. *See Guilbeaux v. Times of Acadiana, Inc.,* 661 So.2d 1027, 1032 (La.Ct.App.1995). The comment is incapable of being proved true or false— one's definition of dishevelled may be another's definition of tidy. As such, the "dishevelled" comment constitutes non-actionable opinion.

 The description of Miracle as in her "early forties," on the other hand, is an assertion of objective fact. It is possible to ascertain Miracle's age at the time of the meeting with Lex described in the article. In fact, Miracle was 39 at the time. That the article added several years to Miracle's actual age, however, does not make it libelous. Taken objectively, the statement is innocuous, albeit inaccurate. It is devoid of defamatory meaning. No reasonable person could conclude that a minor misstatement regarding Miracle's age would damage her reputation in her community or deter other persons from dealing with her. Therefore, the "early forties" statement is not defamatory.

### E. *"Tangled claim"*

 Again, the threshold inquiry is whether the statement that "Nancy Greene laid out a tangled claim to the Monroe estate" is an opinion or an assertion of objective fact. The statement does not qualify as pure opinion. The adjective "tangled," taken in the context of the article, is similar in meaning to "false," which is to say that the statement makes a representation about the legitimacy of Miracle's claim to be the daughter of Monroe. Miracle's genealogy is capable of objective verification. A reasonable trier of fact thus could conclude that the statement expressed or implied an assertion of objective fact. *See Partington,* 56 F.3d at 1153.

Having passed the first hurdle, the "tangled claim" statement falters on the second. In searching a statement for defamatory meaning, the court should consider the specific context in which the statement was made. *Id.* Read in context, the "tangled claim" statement does not purport to represent the author's thoughts on the legitimacy of Miracle's claim to the Monroe estate. The complete sentence in which the statement appears reads: "Nancy Greene laid out a tangled claim to the Monroe estate, and Lex Cusack quickly concluded that she was nuts." Article at 62. It is Lex's state of mind that is being described in the statement. The article does not assert that Miracle had a tangled claim; rather, it asserts that *Lex* thought that Miracle had a tangled claim—a subtle difference in meaning, but enough to disarm Miracle's contention that the statement makes a false assertion of fact regarding her.

### F. *"Nuts"*

 The statement that "Lex Cusack quickly concluded that she was nuts" is not actionable. To be sure, "nuts" is a pejorative term. In certain contexts, it can be a description of the mental state of a person. In the context of the article in question, however, the term is used in its "popular, not clinical, sense" to emphasize how out-

landish Miracle's claim appeared to Lex. *See Weyrich v. The New Republic,* 235 F.3d 617, 624 (D.C.Cir.2001). The statement is an expression of pure opinion couched in "figurative or hyperbolic language." *Gold,* 88 Hawai'i at 101, 962 P.2d at 360.

In addition, the "nuts" statement, like the "tangled claim" phrase preceding it in the same sentence, does not reflect the author's thoughts about Miracle. The language of the statement explicitly states that "*Lex* quickly concluded that she was nuts." Article at 62 (emphasis added). Because the statement relays Lex's subjective evaluation of Miracle and does not assert what the author believes to be the state of Miracle's mental health, it is not defamatory.

G. *"Gladys Baker," "Novelists" and "Forgers," and "Blackmailed J.F.K."*

■ Four of the statements that Miracle claims to be false or defamatory may be analyzed together. The first is the article's statement that Monroe's mother, Gladys Baker was dead at the time Miracle met with Lex in 1986. *Id.* Somewhere later in the article is the second statement, which reads: "Like novelists, forgers inhabit their characters in order to convince. They can't help leaving traces of themselves behind." *Id.* at 72. Several sentences later, the article states that "[t]he forger had to start somewhere. . . ." *Id.* at 73. Within the same paragraph, the article states that "if one believes the Cusack Papers, [Monroe] also blackmailed J.F.K. into creating another, similar trust, telling him that if he didn't she would reveal his ties to the Mob." *Id.*

None of the four statements support Miracle's defamation claim because they do not concern her. For a statement to be defamatory, it must be of or concerning the plaintiff. The first statement concerns Gladys Baker, who, if Miracle is correct, is a close relative of Miracle, but not close enough to be Miracle herself. The second and third statements concern Lex. It is understandable how, with all the talk of forgeries, Miracle might interpret the statements as smears on her character. However, the statements clearly refer to Lex. After comparing "novelists" to "forgers," the article continues: "The author of the Cusack Papers assumed the identity of John F. Kennedy, and also assumed, for briefer moments, the identities of a gallery of historical characters large and tall." *Id.* at 72–73. With regard to the statement that "The forger had to start somewhere," the phrase immediately following implicates the Cusack Papers. *Id.* at 73. Lastly, the fourth statement concerns Monroe, not Miracle. Accordingly, Miracle cannot recover for defamation based on the four statements.

H. *"Nancy Green might be a code name"*

In a paragraph discussing the authenticity of Lex's documents, the article stated, "Another note was later found suggesting that Nancy Green might be a code name for Marilyn Monroe." *Id.* at 72. This is another statement which Miracle claims is defamatory.

A stretch of imagination is necessary to construe this statement as defamatory in relation to Miracle. It in no way imparts any suggestion that would harm Miracle's reputation or deter others from dealing with her. Except for the mention of Nancy Green—one of Miracle's former aliases—the statement is wholly irrelevant to Miracle. Rather, it concerns the authenticity of the documents. Without defamatory meaning, the statement cannot support a claim for defamation.

*I. "If you launder it, is it still dirty?"*

Miracle takes issue with an advertisement appearing at the end of the article. The advertisement shows a picture of $100 dollar bills hanging on a clothesline to dry. Below the picture is the slogan, "If you launder it, is it still dirty?" The advertisement is for the television program "Washington Week in Review."

We need not proceed further than the fact that the communication at issue is an advertisement having absolutely no connection to the article. That it appears in proximity to the text of the article is fortuitous. Since the advertisement is not part of the article, it cannot be interpreted within the context of the article, which means that its connection with Miracle and her reputation is non-existent.

## II. EMOTIONAL DISTRESS

Miracle seeks recovery for emotional distress. As it is unclear whether she is proceeding under an intentional or negligent theory of emotional distress, the Court considers both possibilities.

In order to assert a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must establish: "(1) that the act allegedly causing the harm was intentional; (2) that the act was unreasonable; and (3) that the actor should have recognized that the act was likely to result in illness." *Dunlea,* 83 Hawai'i at 38, 924 P.2d at 206 (quoting *Marshall v. University of Hawaii,* 9 Haw.App. 21, 38, 821 P.2d 937, 947 (1991)). An act is unreasonable if it is "without just cause or excuse and beyond all bounds of decency." *Chedester v. Stecker,* 64 Haw. 464, 468, 643 P.2d 532, 535 (1982) (internal quotation marks and brackets omitted) (quoting *Fraser v. Morrison,* 39 Haw. 370, 375 (1952)). In other words, the act complained of must be "outrageous." *Id.* "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for

the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." *Wong v. Panis,* 7 Haw.App. 414, 421, 772 P.2d 695, 700 (1989) (citing Restatement (Second) of Torts § 46 cmt. h).

Miracle has not established an intentional act that supports her claim for IIED. The act upon which Miracle's emotional distress claim is premised is the publication of the allegedly defamatory article. The article was not defamatory; publication of the article was not "outrageous" for that reason, nor is there the suggestion of any other unreasonable conduct on the part of the *The New Yorker.* Moreover, Miracle has not demonstrated that *The New Yorker* published the article intentionally to injure Miracle. Indeed, Miracle occupies a peripheral role in the article. Accordingly, Miracle cannot recover for IIED.

If Miracle is asserting a claim for negligent infliction of emotional distress ("NIED"), she must show that: (1) *The New Yorker* engaged in negligent conduct; (2) she suffered serious emotional distress; and (3) her negligent conduct was a legal cause of serious emotional distress and physical injury. *See Calleon v. Miyagi,* 76 Hawai'i 310, 320, 876 P.2d 1278 (1994). Miracle must show physical injury to herself or to her property. *Tseu v. Jeyte,* 88 Hawai'i 85, 92, 962 P.2d 344, 351 (1998). She has not alleged or demonstrated physical injury, and thus, she cannot recover for NIED.

## III. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND BUSINESS

Miracle asserts a claim for tortious interference with contractual relations and business. Two separate torts are contained within the claim. The first is tortious interference with contractual

relations ("TICR"). At minimum, a plaintiff asserting a claim of TICR must establish the existence of a contract between the plaintiff and a third party. *Lee v. Aiu,* 85 Hawai'i 19, 32, 936 P.2d 655, 668 (1997) (reciting the elements of TICR). Miracle has not alleged or demonstrated that she entered into a contract with a third party, the performance of which was affected by the publication of the article.

 The second tort alleged in the claim is tortious interference with a prospective business advantage ("TIPBA"). The tort of TIPBA consists of the following elements:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

*Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawai'i 224, 258, 982 P.2d 853, 887 (1999) (footnote omitted). The complaint does not allege facts satisfying the first three elements of TIPBA. Miracle does not allege that she had a valid business relationship or a prospective advantage, or expectancy; that *The New Yorker* knew of any such relationship, advantage, or expectancy; or that *The New Yorker* intended to interfere with the same.

Miracle's claim for tortious interference with contractual relations and business fails as a matter of law.

## IV. UNJUST ENRICHMENT

Miracle claims that *The New Yorker* profited from publication of the article at her expense. For that reason, Miracle asserts a claim of unjust enrichment. The claim is defective in a number of respects. First, she has not alleged or demonstrated that she conferred any benefit to *The New Yorker* that requires restitution. Second, the equitable doctrine of unjust enrichment is based on the underlying concept of restitution, which is injustice. *Small v. Badenhop,* 67 Haw. 626, 636, 701 P.2d 647, 654 (1985). The injustice upon which Miracle's unjust enrichment claim is based is the publication of the allegedly defamatory article. Since the article is not defamatory as a matter of law, there is no injustice to rectify by way of restitution.

## V. PUNITIVE DAMAGES

 To recover punitive damages under Hawaii law, a plaintiff must show, by clear and convincing evidence, that a defendant has "acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Masaki v. General Motors Corp.,* 71 Haw., 1, 16–17, 780 P.2d 566, 575 (1989). Miracle has not shown that *The New Yorker* acted wantonly, oppressively, maliciously, or willfully. Thus, she may not recover punitive damages.

## CONCLUSION

For the foregoing reasons, the Court GRANTS *The New Yorker's* Motion for Judgment on the Pleadings, or in the Alternative, for Summary Judgment. The

Clerk of the Court is directed to enter judgment in favor of *The New Yorker.*

IT IS SO ORDERED.