**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Columbus EWINGS, Defendant–Appellant.**

**No. 90–2306.**

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1991.

Decided July 2, 1991.

Rehearing and Rehearing En Banc Denied Aug. 8, 1991.

Philip A. Guentert, Office of the U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Gregory J. Schlesinger, Schlesinger & Krasny, Chicago, Ill., for Ewings.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

When Debra Ewing[1] died of muscular dystrophy at age 31, her uncle, the Reverend Columbus Ewings, collected over $970,000 as the beneficiary of numerous insurance policies on her life. Between 1971 and 1982, Reverend Ewings had applied for and purchased twenty insurance policies on the life of his niece from nine different companies, naming himself as the beneficiary of each. Why would insurance companies issue life insurance policies on a woman with a chronic disease? Because the Reverend never told them about it. He falsified the insurance applications and, on those occasions when the insurance companies required the insured to sign the application in the presence of the agent, produced a woman—not Debra Ewing—of good health and normal appearance, to sign Debra's name on the application. One of the

---

1. Born Debra Ewings, she later dropped the "s" from her last name.

companies got wise to the scheme when it discovered that Debra's death certificate indicated that she had muscular dystrophy. Ewings was charged with eighteen counts of mail fraud and two counts of making false statements to the Social Security Administration about the number of insurance policies he owned—he said "one"—in the course of applying for benefits in 1986 and 1987, before his niece had died. The jury convicted him on all counts. All but two of the counts involved conduct that occurred before the Sentencing Guidelines became effective on November 1, 1987. The district court sentenced Ewings to concurrent terms of twenty-four months on each of the pre-guidelines counts, to be served consecutively to the thirty-seven months the court sentenced him to serve on the two counts to which the guidelines applied. On appeal, Ewings challenges the district court's decision to admit evidence showing how he spent the proceeds from the insurance policies, the adequacy of the jury instructions, the prosecution's tactic of questioning a witness about prior inconsistent statements on direct examination, and the court's decision to make the sentences on the pre-guidelines and guidelines counts consecutive rather than concurrent. We affirm.

## I.

▆ The government presented evidence to show the jury how the defendant spent the money he received as beneficiary of the policies on his niece's life. This evidence revealed that, between October 1987 and September 1988, Ewings spent almost all of the money he received from the insurance policies. He bought cars, a boat, and jewelry. He took a trip to Las Vegas. He gave over $100,000 to Dorothy Gordon, described by the government as "a female acquaintance of long-standing," and her family. He gave money to his own family members and to his church, and purchased real estate for the church. He paid off a neighbor's mortgage. Only $64,000 of the $970,000 the defendant received was not traced to a specific purchase or cash withdrawal; most of that amount could probably have been accounted for as well had the

government reviewed the checks the defendant wrote for amounts less than $500.

The defendant maintains that this evidence was irrelevant and should not have been admitted. The government counters that it was probative of Ewings' intent to defraud because it established his motive for taking insurance out on his niece. The evidence also establishes, adds the government, the defendant's identity as a participant in the fraud. The district court admitted the evidence for two reasons. The court first observed that the indictment itself contained a paragraph detailing some of the defendant's expenditures. Since Ewings did not contest the inclusion of any of the allegations contained in the indictment, *see* FED.R.CRIM.P. 7(d), the court reasoned that evidence pertaining to the allegations about how he spent the insurance proceeds was not evidence of "other acts," and denied the motion to exclude that evidence. Alternatively, the district court concluded that the evidence relating to Ewings' disposition of the insurance proceeds was "highly probative" of the defendant's motive to commit fraud, Mem.Op. at 10–11, and ruled that it could be admitted under FED.R.EVID. 404(b).

▆ We believe the district court relied too heavily on the defendant's failure to object to the allegations in the indictment concerning the disposition of the insurance proceeds. A defendant's failure to object to the inclusion of extraneous matter waives the defendant's right to complain of prejudice stemming from the jury's knowledge of the irrelevant material contained in the indictment. It does not, however, preclude the defendant from objecting to the admission of evidence introduced during trial to prove the extraneous matter. Evidence is admissible only if relevant to "the existence of any fact that is of consequence to the determination of the action." *See* FED.R.EVID. 401 and 402. If evidence about how the defendant spent the insurance proceeds does not help to establish the proposition that the defendant committed the offense of mail fraud, it is irrelevant; the government cannot make it relevant simply by including allegations about the expendi-

tures in its indictment. The defendant's evidentiary objection was therefore timely.

■ The district court also concluded that the expenditure evidence in this case was probative of Reverend Ewings' motive to defraud the insurance companies. To be relevant, evidence must make more probable "the existence of any fact that is of consequence to the determination of the action." FED.R.EVID. 401. Mail fraud is a specific intent crime, *United States v. Draiman*, 784 F.2d 248, 254 (7th Cir.1986), and motive bears on Ewings' intent when he applied for insurance on the life of his niece, so evidence establishing a motive to defraud is relevant. We question, however, whether the expenditure evidence was probative of motive. The government maintains that the evidence established the defendant's motive because it showed that Ewings had an "appetite" for money. But who doesn't? That the defendant went to Las Vegas, or bought a new car, tells us nothing about why he defrauded the insurance companies. Ewings might have spent the money the same way had the policies been legitimate, and we are reluctant to subscribe to the government's theory that criminal intent may be inferred from the items on his shopping list.

■ Whatever its relevance to motive, the expenditure evidence was relevant to show that the defendant, rather than someone else, committed the fraud. Spending sprees, like other evidence of pecuniary gain, tend to show participation in crimes where financial enrichment is the motive. *United States v. Jackskion*, 102 F.2d 683, 684 (2d Cir.), *cert. denied*, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939) ("[W]here a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden acquisition of money by the defendant is admissible, even though the source of the money is not traced."). In *United States v. Kwitek*, for example, we noted that "[e]xpensive trips, gambling and other instances of free spending and high living may be pertinent in crimes involving a motive of enrichment." 467 F.2d 1222, 1225 (7th Cir.1972). This does not, as the government suggests, mean that evidence of a lavish lifestyle is relevant *to prove* a motive of enrichment; the point is that in crimes where the object is financial enrichment, evidence that one has been enriched is probative of participation in the crime. In *Kwitek* the expenditure evidence was relevant to prove the defendant's participation in a bank robbery, *i.e. whether* he was enriched, not to prove *why* he committed the robbery, and came in the midst of the court's discussion of the sufficiency of the evidence presented at trial to link the defendant with the robbery. *Id. See also United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.1979) (evidence showing that defendant accused of bank robbery was living beyond his means was relevant); *United States v. Crisp*, 435 F.2d 354, 360 (7th Cir.1970) (same). Evidence that a defendant has come into money has been held probative of participation in a number of other crimes as well. *See, e.g., United States v. Wood*, 834 F.2d 1382, 1386 (8th Cir.1987) ("Evidence of the expenditure of a large sum of currency is clearly relevant in a narcotics prosecution as evidence of illegal dealings and ill-gotten gains."); *United States v. Lambinus*, 747 F.2d 592, 596–97 (10th Cir.1984) (affirming admissibility of evidence showing that defendant sold unlawfully acquired food stamps); *United States v. Chagra*, 669 F.2d 241, 256 (5th Cir.1982) (affirming admissibility of evidence of apellant's purchase of expensive private real estate in prosecution under continuing criminal enterprise statute).

The expenditure evidence in this case showed that Ewings received and disbursed virtually all of the proceeds from the policies, a fact that suggests that he was responsible for the incomplete and inaccurate answers that riddled the insurance applications for the policies he purchased. Other evidence established that the policy applications were fraudulent; this evidence established that Ewings was responsible for the fraud. Ewings tried to pin the fraud on the insurance agents who took the applications, and the expenditure evidence helped rebut that defense somewhat by showing that the insurance agents received little, if any, of the proceeds from the policies.

True, the agents could have submitted fraudulent applications just for the commissions, but that theory is, as we shall discuss momentarily, less convincing than one suggesting that the agents received some of the proceeds of the fraudulent policies. We therefore conclude that although the evidence showing that the defendant engaged in a colorful spending spree after his niece's death was not relevant to show the defendant's motive for committing the fraud, it was relevant to show that he was solely responsible for the fraud and affirm its admission on that basis. *Dairyland Financial Corp. v. Federal Intermediate Credit Bank*, 852 F.2d 242, 244 (7th Cir.1988) (we may affirm on any ground that finds support in the record).

■ We caution, however, that courts should carefully balance the probative value of expenditure evidence against the factors enumerated in Rule 403. This type of evidence should not be a vehicle by which the government can indiscriminately introduce highly prejudicial evidence of extrinsic acts. Such evidence will often give rise, as it may have here, to inferences about the defendant's character. In addition, it will often be cumulative of other evidence presented to show the defendant's participation in the crime. Courts must be sensitive to these concerns when considering whether to admit expenditure evidence. In this case, the expenditure evidence was not cumulative since it was the only evidence that showed that the insurance agents did not share in Ewings' bounty. Moreover, the district court did consider the possible prejudicial impact of the evidence in this case. The expenditure evidence undoubtedly suggested to the jury that the defendant, despite his religious credentials, was not a paragon of virtue, and that, we suspect, contributed to the government's desire to present it. Nevertheless, we agree that this evidence was unlikely to render the jury incapable of objectively assessing the relevant evidence against the defendant. A sojourn in Las Vegas by a man of the cloth might raise some eyebrows, but seems to us unlikely to provoke any but the most puritanical to abandon their oath to evaluate the evidence against the defendant objectively. Moreover, the defendant concedes that "[much] of the expenditure evidence offered by the government was defused." Appellant's Brief at 12a. The picture the government presented of the defendant's spending spree included evidence that showed that he gave away much of the money to charity—the defense also presented evidence of the altruistic nature of many of his expenditures—a fact that would certainly help neutralize whatever prejudicial impact some of his other expenditures may have created.

■ We also conclude that even had this evidence been inadmissible, it was surely harmless. "An evidentiary error is harmless if the untainted evidence against the defendant is overwhelming or if the error had such slight effect that it could not have swayed the jury." *United States v. Monzon*, 869 F.2d 338, 345 (7th Cir.), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). The evidence the government presented to prove that the defendant intended to defraud the insurance companies was, indeed, overwhelming—it showed that the defendant provided information he knew to be false on *twenty* different insurance applications. The evidence showed that the defendant lied on the applications by stating that his niece lived with him in Chicago when, in fact, she lived with her parents in Mississippi. He said she was a student, although her disease had prevented her from ever attending any school. He told the insurance companies that Debra was—depending on which application we look at—between five feet and five feet, eight inches tall. In reality, Debra's exact height could not be determined because her spine was so badly curved, but she was clearly much smaller. She weighed no more than 50 pounds, but Reverend Ewings listed her at between 100 and 135 pounds. He even went so far as to have impostors pose as his niece, when necessary, to fool the agents. The government presented evidence that Debra's signatures on the applications had been forged. Ewings invented a Social Security

number for Debra. He said she had no siblings, when in fact, she had seven, four of whom had also been afflicted with muscular dystrophy. Three died from the disease in their teens, and the fourth died in an automobile accident after leaving the hospital where she was receiving treatment. And of course, he failed to inform the insurance companies about Debra's disease and the medical problems it spawned. Some of the applications represented that Debra had never been hospitalized.

Reverend Ewings' defense was that the fraudulent scheme was that of the insurance agents rather than that of the defendant, but that theory makes no sense. *Cf. Phelps v. Duckworth*, 772 F.2d 1410, 1414 (7th Cir.1985) (en banc) (defendant's implausible defense supports finding of harmless error). Ewings, not the insurance agents, was the beneficiary of the policies. The agents gained only commissions for writing the policies and it seems more than a bit incredible that agents of nine different insurance companies would "choose the same young girl with muscular dystrophy as a vehicle for earning a few dollars on the sale of life insurance to her uncle." Appellee's Brief at 18. If the insurance agents wanted to earn a few extra commission dollars by selling life insurance policies to people who would have been otherwise uninsurable, it would have made far more sense for them to obscure their work by writing the policies on different individuals rather than aggregating almost one million dollars of coverage on a single individual with a highly visible illness.

Given the strength of the government's case and the minimal prejudice the expenditure evidence could have created, we conclude that even had the admission of the expenditure evidence been erroneous, the error would have been harmless.

## II.

■ The defendant also cites as error the trial court's refusal to instruct the jury as to his theory of the case. This claim is a red herring. The defendant mischaracterizes the events at trial, for the record reveals that the defendant asked the court *not* to give the theory of defense instruction the court had previously approved.

Originally, the defendant tendered the following instruction (Defense Instruction No. 6) as its theory of defense:

An insurer is bound by the fraudulent acts of its agent if the agent acts within the scope of his authority, even though with fraudulent motive.

The defendant apparently offered this instruction for the proposition that since insurers are bound by the frauds of their agents, the companies could not be victims of fraud if their agents were in on the scheme. We needn't tarry with the problems inherent in that argument, however, for the district court properly rejected it. The court proposed an alternative instruction, however, that incorporated the defendant's theory that the fraudulent scheme was that of the insurance agents rather than that of the defendant. The court's proposed instruction read:

You have heard testimony from some of the insurance agents that they made misrepresentations on the applications for insurance policies purchased by the defendant. You may consider this testimony in determining whether or not the defendant acted with an intent to defraud the insurance companies. However the fact that an insurance agent made misrepresentations on an application does not in itself mean that the defendant had no intent to defraud.

Tr. at 1311–12. The government objected to this instruction on the ground that there was little or no evidence of misrepresentations by the insurance agents, and that what evidence there was went to the agents' credibility rather than to the defendant's intent. The defendant, however, asked the judge to give the instruction, stating that "it was well worded, well reasoned," and "it is certainly consistent with many of the things I would like to say to the jury." Tr. at 1317. At no point did the defendant ask the district court to give his original instruction rather than the court's alternative instruction, and at no point did he object to the court's instruction.

Later, just before closing argument, Ewings' counsel again requested the instruction drafted by the court (which had been modified slightly by the court). Shortly thereafter, however, he decided that the instruction might not be that helpful after all, and asked the court not give the instruction:

> In thinking about the instruction, and in thinking about the Court's comments about how this might well favor the Government, and in looking at the language that the agents themselves may have made certain misrepresentation [sic] which, of course, leads to the conclusion that the defendant may have made certain misrepresentations, *I think I would just like to go at this with the Government in argument and not instruct the jury. I wouldn't ask for this instruction, Judge.*

Tr. at 1352 (emphasis added). The defendant makes no attempt to explain why this statement does not constitute an affirmative waiver of his right to a theory of defense instruction, and we can think of none. Up until this point, the court had repeatedly solicited alternative instructions from the defendant, who simply replied that he was happy with the instruction drafted by the court. He cannot complain now, after deciding at the eleventh hour that he did not like the court's instruction after all, that the court denied him the opportunity to present a theory of defense instruction. He never proposed one after rejecting the court's instruction. Even at this late date, the defendant has not proposed an instruction encompassing his theory of defense, nor does he maintain that the district court erroneously denied the instruction on vicarious liability he tendered originally. If, as the defendant claims, the jury was inadequately instructed as to the theory of the defense, the error is his, not the district court's.

### III.

■ The defendant contends that the government impermissibly bolstered the credibility of one of its witnesses. Sol

Hicks, one of the insurance agents who testified that the defendant had purchased an insurance policy on his niece, had also written policies on the lives of the Ewings' sons. The prosecutor asked Hicks about several statements on the insurance applications for the defendant's sons that were inconsistent with Hicks' testimony about Ewings' applications for insurance on the life of his niece. Ewings claims that this effort amounted to an improper attempt to rehabilitate the witness prior to an attack on his credibility on cross-examination.[2] Minimizing the "sting" of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic, however, one practiced by prosecutor and defendant alike. *See, e.g., United States v. Marroquin*, 885 F.2d 1240, 1246–47 (5th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990) (prior acts probative of dishonesty); *United States v. Davis*, 838 F.2d 909, 917–18 (7th Cir.1988) (plea agreements); *United States v. Bileck*, 776 F.2d 195, 197–98 (7th Cir. 1985) (prior convictions); *United States v. Frappier*, 807 F.2d 257, 259 (1st Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987) (bias); *United States v. Koppers Co.*, 652 F.2d 290, 299 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) (prior inconsistent statements); *United States v. Faymore*, 736 F.2d 328, 334 (6th Cir.), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984) (witness's ability to perceive event). In *United States v. LeFevour*, 798 F.2d 977, 984 (7th Cir.1986) (citation omitted), we explained:

> A trial is not just combat; it is also truthseeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. What is sauce for the goose is sauce for the gander.

---

**2.** The defendant does not object, however, to the questions the prosecution posed to Dorothy Gordon about her prior inconsistent statements to the Grand Jury.

That this defendant found the sauce unpalatable does not give us cause to question the recipe.

## IV.

■ The defendant's final claim asserts that the district court's decision to make his sentence on the pre-guidelines counts consecutive to the sentence she imposed on the two guidelines counts constituted duplicative punishment. The court based the guidelines sentence on the defendant's entire fraudulent scheme, including the acts covered by the pre-guidelines counts. *See* U.S.S.G. § 3D1.2(d). The defendant submits that the sentences should have been concurrent since the sentences were based on the same conduct. 18 U.S.C. § 3584(b) directs the sentencing court to "consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)," and among those factors are the applicable guidelines and policy statements of the Sentencing Commission. *See* 18 U.S.C. §§ 3553(a)(4) and (5). The guidelines, however, are not applicable to offenses committed before November 1, 1987, *United States v. Stewart*, 865 F.2d 115, 116–18 (7th Cir.1988), and courts need not use them in such cases. Moreover, even though the guidelines generally eschew consecutive sentences except where necessary to implement the applicable guideline range, *see* §§ 5G1.2(c) and (d), "nothing in the guidelines or the Sentencing Reform Act precludes the court from ordering that a sentence imposed on a pre-guidelines count be served consecutively to a sentence imposed on a guidelines count." *United States v. Watford*, 894 F.2d 665, 669 (4th Cir.1990). Making the sentence on the pre-guidelines counts concurrent with the sentence on the guidelines count would have been more consistent with the approach of the guidelines, but neither § 3553 nor the guidelines obligated the court to apply the guidelines to nonguidelines counts. We therefore conclude, along with every other circuit to address this question, that the district court had the discretion to make the defendant's guidelines and pre-guidelines counts consecutive. *See United States v. Lincoln*, 925 F.2d 255, 256–57 (8th Cir.1991), *petition for cert. denied,* — U.S. —, 111 S.Ct. 2838, 115 L.Ed.2d

1006 (1991); *United States v. Parks*, 924 F.2d 68, 72–74 (5th Cir.1991); *Watford*, 894 F.2d at 669–70.

Finally, we note that this is, ultimately, a futile, and not very compelling, argument. We can assume that the court engaged in "double counting" the defendant's crimes only if we assume that the court considered the guidelines sentence of 37 months to adequately penalize the defendant's conduct. Clearly, it did not. Had the guidelines been applicable to all the counts, the court would have had the difficult task of justifying an upward departure from the guideline range, but the existence of pre-guidelines counts gave her broad discretion to increase the defendant's sentence. The court could have sentenced the defendant to five years on each of the eighteen pre-guidelines counts for which he was convicted. *See* 18 U.S.C. §§ 1001 and 1341. Given the wide scope of the court's discretion to sentence the defendant on the pre-guidelines counts, it is immaterial whether the court made the defendant's sentences on those counts consecutive to his sentence on the two guidelines counts. The court carefully considered the nature of the defendant's crimes and the specific facts of the case and concluded that the defendant's crimes warranted a period of incarceration in addition to that afforded by the guidelines. It did so by making the defendant's pre-guidelines sentence consecutive to the guidelines sentence, but could have reached the same sentence by means of an infinite number of other permutations among the pre-guidelines counts. The court could certainly have sentenced the defendant to 61 months on the pre-guidelines counts alone; there seems little reason then, at least in this case, to quibble with the alternative route the court took to reach the same result.

## V.

For the foregoing reasons, the convictions and sentence of the defendant are

AFFIRMED.