NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 09-1739
_____

MICHAEL THOMAS JOYCE,
                              Appellant,

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cr-00031)
District Judge: Honorable Maurice B. Cohill, Jr.
_____

Submitted Under Third Circuit LAR 34.1(a)
February 4, 2010

Before: McKEE, HARDIMAN, *Circuit Judges,* and RUFE[*], *District Judge*

(Filed: April 6, 2010)

_____

OPINION OF THE COURT
_____

_____

[*] The Honorable Cynthia M. Rufe, District Judge for the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.

RUFE, *District Judge*

Michael Thomas Joyce appeals his conviction and sentence. A jury in the Western District of Pennsylvania found Joyce guilty of three counts of mail fraud (18 U.S.C. §§ 1341 and 2) and five counts of money laundering (18 U.S.C. §§ 1957 and 2). He was subsequently sentenced to forty-six months of confinement, three years supervised release, a special assessment of $800, forfeiture of property, and restitution in the amount of $440,000. Joyce claims that the District Court (1) abused its discretion in denying his motion for a new trial, (2) erred in its failure to exclude expenditure evidence, (3) erred in calculating the sentencing guidelines range by failing to offset the value of the loss by any legitimate claims, and (4) failed to consider several of his sentencing arguments and to articulate its reasons for imposing a mid-range sentence, as required by 18 U.S.C. § 3553. For the reasons outlined below, we will affirm Joyce's conviction and sentence.

**Factual and Procedural Background**

Because we write for the parties, who are familiar with the facts and procedural history, we recount only those aspects of the case that are essential to our ruling.

On August 10, 2001, Joyce was in minor car accident in which he was rear-ended by Amber Cooper at a relatively low speed.[1] Joyce's car, a brand-new Mercedes, suffered minor damage to the trunk lid, which was repaired for $2700. Cooper's automobile insurance

---

[1] Cooper testified that she was driving approximately 2-3 miles per hour. The accident reconstruction expert for the government estimated that the accident occurred at under 5 miles per hour. Joyce's own expert estimated that the accident occurred at 8-11 miles per hour.

2

policy covered the cost of the repair. Cooper's vehicle was not damaged.

The criminal charges in this case arose from the personal injury insurance claims filed by Joyce in the aftermath of this minor automobile accident. Cooper was insured by State Farm Insurance Company ("State Farm"), with policy limits of $50,000. Joyce was insured by Erie Insurance Group ("Erie") with whom he maintained two underinsured motorist policies for a total of $500,000 in coverage.

Nearly a year after the accident, in June 2002, Joyce filed a personal injury claim with State Farm, alleging neurological and muscular-skeletal injuries from the accident, as well as problems with concentration, memory and comprehension. At all times relevant to this case, Joyce was a sitting judge on the Superior Court of Pennsylvania. Although he did not miss any work due to these injuries, he claimed that work was more difficult and took more time to complete, and he claimed to have difficulty traveling to fulfill his judicial duties. Joyce also informed State Farm that since the accident he had lost his ability to exercise, scuba dive, and golf. State Farm considered his claim credible, largely because he was a judge, and settled the claim for the policy limit ($50,000) on September 3, 2002.

Joyce then contacted his own insurance company, Erie, on or about September 10, 2002 to file an underinsured motorist claim for personal injuries. He provided copies of his medical records to the claims adjuster, as well as several medical authorizations and an unsolicited letter entitled Narrative Statement of Damages ("Narrative"), which detailed his alleged injuries and the impact of the claimed injuries on his current work abilities, leisure

activities, and his future career trajectory.[2] The Narrative was written in the third person, and Joyce referred to himself as "Judge Joyce" more than 100 times. After Joyce threatened litigation, Erie settled his claim on November 26, 2002 for $390,000 without an independent investigation of the facts alleged in the Narrative. Employees of Erie testified that they believed Joyce's claims were truthful and accurate because of his position as a Superior Court judge, and therefore did not conduct an independent investigation of his claims.

In May 2003, Shelane Buehler, Joyce's ex-fiancée, wrote letters to the Pennsylvania Judicial Conduct Board ("Board"), as well as various media outlets, alleging that Joyce had committed "insurance fraud." Instead of signing her name, she signed the letters, "an outraged citizen." The Board referred the matter to the FBI, which began an investigation.

On August 15, 2007, Joyce was charged by grand jury indictment with three counts of mail fraud, in violation of 18 U.S.C. § 1341, based on the insurance claims Joyce filed for injuries he claimed he sustained in the automobile accident with Cooper, and six counts of money laundering, in violation of 18 U.S.C. § 1957, for the use of the funds he received in settlement of those claims. Joyce entered a plea of not guilty.

On August 26, 2008, Joyce filed a motion *in limine* to exclude the introduction of

---

[2] In his Narrative, Joyce informed Erie that he had received the Republican nomination for the Pennsylvania Supreme Court in 2001, but was unable to run due to his mother's illness. He wrote that he withdrew from that race expecting to be nominated again in 2003, but due to his injuries he lacked the mental and physical stamina to campaign for that position. Evidence at trial, however, revealed that Joyce never received the nomination to run for the state Supreme Court. Nevertheless, because Erie considered him credible, this claimed loss of a career opportunity was factored into the settlement Erie reached with Joyce. App. Vol. II, 209, 212-214, 239.

financial records of post-settlement expenditures which were not related to the money laundering counts. The District Court denied the motion on October 15, 2008 and re-affirmed its ruling at trial. On October 22, 2008, a four-week jury trial commenced before Senior District Court Judge Maurice Cohill, Jr., which included testimony from lay and expert medical witnesses.

Prior to the August 2001 accident, Joyce had sustained neck and arm injuries in an earlier automobile accident. In 1992, he had a cervical fusion at C5-6 and C6-7 to treat the injuries. Joyce fully recovered prior to the August 2001 accident, and after his recovery from that surgery he was active and athletic and did not miss a day of work, according to his Narrative. Shortly after the August 2001 accident, Joyce was examined by Dr. David McGee, the neurosurgeon who performed his 1992 cervical fusion operation. Radiological studies indicated that the fusion site had not been compromised by the August 2001 accident.

During visits to nine physicians and specialists from August 2001 to January 2003, Joyce sought treatment for complaints of cervical and lumbar discomfort as well as persistent headaches and fasciculation (slight, involuntary muscle twitching). Joyce expressed concern that his symptoms might be caused by Lou Gehrig's disease (Amyotrophic Lateral Sclerosis or "ALS").[3] However, a specialist ruled out ALS in May 2002, and Joyce was cleared to return to his normal level of activity. It was ultimately determined that the fasciculations Joyce was experiencing were not medically significant. In October 2002, Joyce was referred

---

[3] Joyce did not present any evidence suggesting that ALS could be caused by a motor vehicle accident.

to neurosurgeon Dr. Matt El-Kadi for a consultation; the resulting MRI reports revealed that he suffered from stenosis at C3-4, a C3-4 annular bulge with impact on left C4 or C5 nerve roots, an addular bulge at C5-6 and an annular bulge at L4-5 with encroachment upon L5 nerve roots. Dr. El-Kadi diagnosed Joyce with age-related "arthritis in the neck and low back" and recommended conservative treatment. He found the neurological examination unremarkable for a man Joyce's age. Although Joyce's insurance settlement from Erie was based in part on Joyce's allegation that his doctors advised him to have surgery, he, in fact, received no such recommendation from any of the nine doctors he consulted following the August 2001 accident.

In April 2002, Joyce began training to become a pilot and completed forms for his FAA physical examination, wherein he disavowed any medical condition, claimed to take no medications, and denied visiting any doctors in the preceding three years. During the FAA physical exam, Joyce did not mention any pain, discomfort, or fasciculation, nor did he mention concerns about his concentration, comprehension or memory to the examining physician. Although he makes much of a "closed head injury" and nerve damage to his leg from a "seat belt injury" in his Narrative, he did not disclose any such injuries to the FAA. Joyce passed the thorough FAA physical examination and was cleared to pilot airplanes.

Joyce did not testify at trial, but submitted a defense in which he called his family (his current wife, two of his ex-wives, his daughter-in-law, and his two sons), some of his treating physicians, and several judicial colleagues and co-workers. Joyce presented medical and lay testimony that established the fact that he had complained of injuries and pain following the

collision with Cooper. Testimony reflected that Joyce sought medical attention and reported to his doctors that he was experiencing ongoing pain and weakness.

Both Joyce and the government addressed Joyce's tendency to believe that his minor ailments were symptoms of more serious health concerns, even when reassured otherwise by his doctors. Joyce's primary care physician testified that Joyce often required substantial proof to dispel his fears of having a serious illness.

Joyce presented evidence from his children regarding his difficulty finishing a round of golf after the August 2001 accident and other evidence of pain-related changes in his activity level. Although Joyce did not miss a day of work, nor ask to reduce his caseload, his staff testified that his health deteriorated and he experienced a great deal of pain while in the office. However, the jury also heard testimony that Joyce took long drives, trained to fly and piloted numerous flights during the time he claimed to be suffering from debilitating pain. The jury also learned that he purchased a motorcycle with the insurance proceeds.

At the time of the August 2001 accident, Joyce was residing with his then-fiancée Shelane Buehler. The five-year relationship with Buehler ended in July 2002 when Joyce broke off their engagement. Although they were living together at the time of the August 2001 accident and for most of the year following the accident, Buehler claimed that she was not aware that Joyce had been seeing a succession of physicians nor had she witnessed him taking any prescribed medication. In contrast to the testimony of Joyce's children, Buehler testified that Joyce continued his prior, high level of physical activity following the August 2001 accident, which included golfing, rollerblading, scuba diving, and frequenting the

7

fitness club. Golf score cards, airline tickets, and fitness club records corroborated her testimony.

Joyce's breakup with Buehler was acrimonious, and during the months following the breakup the two fought over how to disentangle their financial commitments. By August 2002, Joyce had moved out of the house he had shared with Buehler and was living out of his Superior Court chambers, purportedly due to financial hardships. He paid the courthouse building landlord $100 a month "to keep it on the up and up because it was state-leased property." Just days before receiving the $390,000 insurance settlement check from Erie in November 2002, Joyce had only $47.46 in his checking account.

When he received the insurance settlement, Joyce immediately opened a T.D. Ameritrade investment account and deposited $300,000. All of the money in the brokerage account came from the settlement check. In March 2003, Joyce began spending the insurance settlement. He made a $95,000 down payment on a $360,000 home and spent $22,000 on home furnishings, $3000 on a home theater system, $7000 on a hot tub, and $6000 on marble countertops for his new home. He also put a $27,500 deposit on a private airplane, purchased a $19,000 Harley Davidson, and took two scuba diving vacations to Bonaire, Mexico. Finally, he paid $5,600 for his future third wife to undergo cosmetic surgery and $15,000 for her engagement ring. Notably, none of the insurance money was spent on surgery or other treatment for his alleged injuries. By the summer of 2003, Joyce had spent nearly $250,000 of the insurance money.

On November 19, 2008, the jury returned a guilty verdict on all counts. On March

8

5, 2009, the District Court issued an opinion and order denying Joyce's Motion to Dismiss and/or For Judgment of Acquittal and Motion for New Trial. The District Court found that "a rational jury could have concluded that the interstate commerce element of the money laundering claim was established" and held that "the jury's verdict was not against the weight of the evidence." Nor did the District Court find any "error due to the admission of Defendant's financial transactions unrelated to the money laundering counts. To the extent that this extrinsic evidence was prejudicial it is outweighed by the weight of the other evidence that supports the jury's verdict."

Following the guilty verdict, the Probation Office prepared a Pre-sentence Investigation Report. This report set forth the following Offense Level Computation: the adjusted offense level for mail fraud (Counts 1 and 3) was 21,[4] increased by 1 level for conviction of money laundering (Counts 4 through 9)[5], and 2 levels for abusing his position of trust, for a total offense level of 24. Joyce objected to a 2 level enhancement for abusing his position of trust. The District Court sustained his objection and calculated Joyce's guidelines range based on a total offense level of 22.

Joyce also objected to the 14-level increase based on the loss table. He argued that he had made legitimate claims in excess of $50,000, an amount which should be deducted

---

[4] U.S.S.G. § 2B1.1(a)(1) sets a base offense level of 7, and the loss table at § 2B1.1(b)(H) called for a 14-level increase in the base offense level when the loss is between $400,000 and $1,000,000.

[5] U.S.S.G. § 2S1.1(b)(2)(A) recommends an increase by one level when a defendant is convicted under 18 U.S.C. § 1957.

from the $440,000 he received in settlements from State Farm and Erie, thereby resulting in a fraud loss under $400,000. The guidelines loss table provides for a 12-level increase if the fraud loss is between $200,000 and $400,000, and Joyce argued that, because of his legitimate claims based on his actual medical condition, the loss fell into that lower range. The District Court, however, denied his objection after it considered evidence regarding actual loss, potential or intended loss, and any argued exclusions, finding that $440,000 was a reasonable estimate of the fraud loss.[6]

On March 10, 2009, the District Court sentenced Joyce to serve forty-six months in custody, a midrange guidelines sentence,[7] followed by three years of supervised release, and to pay a special assessment of $800 and restitution of $440,000.[8]

**Discussion**

### A.    Motion For A New Trial

Joyce appeals the denial of his motion for a new trial, arguing that the District Court erred when it found that the jury verdict was not contrary to the weight of the evidence. Under Federal Rule of Criminal Procedure 33, a district court may vacate a criminal

---

[6] As explained below, the District Court was at liberty to use either the actual or intended loss to calculate a reasonable loss figure. *United States v. Dullum*, 560 F.3d 133, 138 (3d Cir. 2009).

[7] The applicable guidelines range was 41 to 51 months of imprisonment.

[8] The District Court also entered an *in personam* forfeiture judgment in the amount of $440,000, and also ordered forfeiture of Joyce's residence and his 2003 Harley Davidson (both of which were determined to have been purchased in whole or part with the insurance proceeds).

judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, a district court may order a new trial only if, after independently weighing the evidence, it concludes that the verdict was contrary to the weight of the evidence *and* that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008). Rule 33 motions are disfavored and are "granted sparingly and only in exceptional cases." *Id*. at 1005 (citing *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). We review the District Court's decision for abuse of discretion. *Id*.

Joyce attacks the weight of the evidence proving his specific intent to defraud Erie, a required element of mail fraud under 18 U.S.C. § 1341.[9] The government highlights the Narrative as a key piece of evidence of his intent. In the Narrative, Joyce made unsupported assertions that he would need major surgery to relieve the pain, and further noted that the surgery itself would limit his mobility. He also made misstatements about his nomination for a position on the Pennsylvania Supreme Court. He failed to report that he had passed an FAA medical examination and was piloting planes with an FAA license acquired after the August 2001 accident. Joyce represented that his injuries had prevented him from working out, playing golf, or swimming. Specifically, Joyce told Erie that he had not been able to complete a full round of golf or to go scuba diving since the accident. Testimony and other

---

[9] The essential elements of mail fraud are: 1) existence of a scheme to defraud; 2) defendant's participation in that scheme; 3) specific intent to defraud; and 4) use of the United States Postal Service in furtherance of the scheme. *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir. 1994).

evidence showed these representations to be false. Joyce's use of judicial letterhead, and the continuous reminders of his status as a judge in his correspondence and his Narrative are also evidence that he intentionally used his position to make his false claims more credible.

The medical evidence did establish that Joyce had minor cervical and lumbar injuries, but did not suggest that these injuries were caused by the August 2001 accident. In fact, the evidence suggested that these injuries were age-related, degenerative changes. Given that the medical evidence contradicted Joyce's version of the cause and extent of his injuries, and that evidence of his post-accident activities contradicted claims Joyce made to the insurance companies, the jury finding that Joyce acted with intent to defraud is not contrary to the weight of the evidence.

Joyce points to the undisputed evidence that he harbored many fears about his health and argues that he sincerely believed he was severely injured or ill even in the face of medical evidence that he was not. Additionally, Joyce argues that his ex-fiancee, Buehler, was angry and vindictive and therefore not a credible witness to his post-accident medical condition and activity level. Joyce presented evidence on both points at trial. The District Court concluded that the jury could find Buehler was feeling angry and vindictive towards Joyce and still find that her testimony about his post-accident physical condition and activity level was more credible than the testimony of his staff and family members, especially in light of the fact that Buehler's testimony was corroborated by other evidence such as golf scorecards, gym records, flight records, etc. According to the District Court, Joyce's activities after the August 2001 accident were inconsistent with a sincere belief that he was

12

seriously injured.

We agree with the District Court's finding that a rational juror could believe Buehler's testimony, conclude that Joyce could not sincerely believe he was suffering from severe injuries in light of his activities, and further conclude that Joyce had knowingly made material misstatements of fact to Erie. The jury could infer from Joyce's numerous exaggerations and misstatements a specific intent to defraud Erie.[10] Given the weight of the evidence, there is no support for the view that the jury convicted an innocent man. Joyce does not meet his high burden here of showing that a new trial was warranted. Accordingly, we hold that the District Court did not abuse its discretion in denying Joyce's motion for a new trial.

## B.    Failure to Exclude Evidence of Joyce's Expenditures

Joyce also appeals the denial of his motion to exclude evidence of his post-settlement expenditures. Joyce argues that the expenditure evidence submitted by the government, which showed that he spent the Erie insurance proceeds on extravagant purchases, was bereft of any probative value and was highly prejudicial, and as such it should have been excluded under Federal Rules of Evidence 401 and 403. We review the District Court's decision to admit the evidence for abuse of discretion. *United States v. Mathis*, 264 F.3d 321, 326-7 (3d Cir. 2001).

---

[10] Even if the District Court did err in finding Buehler's testimony credible, we find that while Buehler's evidence bolsters the government's case regarding the element of specific intent to defraud, Buehler's testimony regarding Joyce's post-accident activities was not necessary for the jury to find intent to defraud, given the other evidence discussed herein. Therefore, any error was harmless.

13

Joyce relies principally on a Seventh Circuit case, *United States v. Ewings*, 936 F.2d 903 (7th Cir. 1991), where the court held that evidence of how a defendant spent the proceeds of fraudulently obtained life insurance policies was not probative of his motive for committing the fraud because it was entirely possible the defendant would have made extravagant purchases even if the policies had been legitimately obtained. *Id.* at 906. Joyce argues that under *Ewings*, evidence of his expenditures was not probative of his intent to defraud Erie or of his motive for doing so and thus should have been excluded.

We find that *Ewings* is distinguishable from the case at bar. In *Ewings*, evidence of how the defendant spent the insurance proceeds was entirely unconnected to the fraudulent actions he took to obtain life insurance policies. In the present case, by contrast, the government's evidence showed that Joyce spent the funds he obtained from Erie on activities that he led Erie to believe he could not do—such as scuba diving, traveling, and golf—to obtain the funds in the first place. Joyce's post-settlement expenditures thus showed that he knowingly misrepresented his physical condition to Erie and were therefore probative of his intent to defraud the insurance company. Moreover, Joyce's post-settlement expenditures further demonstrated that *none* of the funds he obtained from Erie were used to pay for medical treatment, suggesting that Joyce's injuries were not as bad as he contended.

Evidence of Joyce's financial situation and post-settlement expenditures was also probative of motive. The Government introduced evidence of Joyce's spending habits both before and after the Erie settlement, as well as evidence of the salary that he earned and his financial difficulties. Financial records showed that Joyce was in financial straits at the time

he received the Erie settlement. Living in his judicial chambers with only $47 in his bank account, Joyce had a significant motive to defraud Erie in order to fund a more extravagant lifestyle. Evidence of his profligate post-settlement expenditures confirmed this.

Because we find that the expenditures were probative as to Joyce's intent to defraud and motive, they would be admissible unless the probative value was substantially outweighed by danger of unfair prejudice. Speaking to prejudice, Joyce expresses concern that the jury was influenced by "class prejudice" due to the luxurious nature of his purchases. However, the jury was properly instructed not to be swayed by any such prejudice or bias,[11] and Joyce has not shown anything to suggest that the jury was unable to comply with this instruction.

Joyce has not shown that the probative value of his post-settlement expenditures was substantially outweighed by the danger or any unfair prejudice. Accordingly, we find that the District Court did not abuse its discretion in allowing the expenditure evidence at trial.

### C. Procedural Reasonableness of Joyce's Sentence

Joyce also argues that his sentence was procedurally unreasonable for several reasons.

Joyce first argues that the District Court erred when it found that the loss caused by his fraud exceeded $400,000. This finding triggered a fourteen-level increase in his offense level under § 2B1.1(b)(1)(H) of the sentencing guidelines. Joyce argues that under *United States v. Evans,* 155 F.3d 245 (3d Cir. 1998), the loss calculation should have been offset by the value of his legitimate claims for injuries sustained in the automobile accident. He states,

---

[11] App. II, 82; App. VI, 2114.

15

without proof, that the legitimate value of his claim was at least $50,000, which would reduce the actual loss amount from $440,000 to $390,000. Had the District Court offset the loss in this manner, his base offense level would have been enhanced by twelve levels rather than fourteen.

We review the factual findings made by a district court concerning the amount of loss for clear error. *United States v. Jimenez*, 513 F.3d 62, 85 (3d Cir. 2008). As a general rule, after the government establishes a prima facie case as to the amount of loss through fraud, the burden shifts to the defendant to produce evidence that the government's loss figure is incomplete or inaccurate. *Id*. at 86. At trial the government made a prima facie showing that Joyce received a total of $440,000 in insurance settlement funds ($50,000 from State Farm and $390,000 from Erie). Despite Joyce's claim that he had actual injuries worth at least $50,000, he offered no evidence in support of this figure. The District Court is not required to credit an usupported allegation, and here it did not. It found the actual losses were in excess of $400,000. Given the factual evidence, this was not clear error.

Furthermore, as an alternative basis for the 14-level enhancement, the District Court noted that the intended loss from Joyce's scheme was $550,000, as Joyce was attempting to settle for the full policy limits ($50,000 from State Farm and $500,000 from Erie). It is settled law in this Circuit that the sentencing guidelines require that the loss calculation reflect the greater of the actual loss caused by defendant's illegal actions or the amount of loss the defendant intended to cause. *United States v. Dullum*, 560 F.3d 133, 138 (3d Cir. 2009); *United States v. Feldman*, 338 F.3d 212, 215 (3d Cir. 2003). Using the intended loss

16

as a starting point, Joyce's proposed offset of $50,000 based on his legitimate claim argument would reduce the intended loss amount only to $500,000, and the 14-level enhancement would still apply. Thus, even if the District Court erred in failing to offset the loss, which it did not, that error would have been harmless with regard to the offense level.

The District Court only needed to make a reasonable estimate of the loss. *Jimenez*, 513 F.3d at 85. We find that the District Court did so. Accordingly, we find that the District Court did not err by including a 14-level enhancement in the sentencing calculation.

Joyce next contends that the District Court failed to consider his request for a variance based on the fact that his money laundering convictions were based solely on his spending of the funds he received in the insurance settlements, and not on any independent criminal conduct. As the government points out, such an assertion is tantamount to arguing that the guidelines overstate the seriousness of his money laundering convictions. Review of the record does not indicate that the District Court *explicitly* considered Joyce's argument. But a district court need not expressly consider every specific argument made by defense counsel when those arguments are meritless or where the record makes clear that the court took the argument into account at sentencing. *See United States v. Sevilla*, 541 F.3d 226, 232 (3d Cir. 2008). Here, the District Court implicitly rejected Joyce's argument, noting that it had "consider[ed] the parties['] arguments" and had concluded that Joyce's sentence "adequately addresses the nature and circumstances of this offense" and further "reflects the seriousness of the offense." Accordingly, Joyce's argument that his sentence was procedurally unreasonable because the District Court did not address his arguments about the seriousness

17

or specific circumstances of his money laundering conviction fails.

Joyce next argues that the District Court failed to re-consider at sentencing the same argument that he made in the context of his Guidelines calculation: that his claims were at least partially legitimate and that the Guidelines therefore overstated the amount of loss caused by his fraud. However, the District Court had already considered and rejected this same argument by Joyce's counsel when calculating Joyce's Guidelines range and was not required to address it again when imposing Joyce's sentence. *Sevilla*, 541 F.3d 226, 232.

Finally, Joyce contends that his sentence is procedurally unreasonable because the District Court failed to articulate why it chose to sentence him to forty-six months imprisonment, which was essentially the midpoint of the Guidelines range, and not a lower Guidelines sentence as required by 18 U.S.C. § 3553(c)(1). Joyce further argues that the District Court failed to give meaningful consideration to the § 3553(a) sentencing factors.

In determining the appropriate sentence, the District Court must consider both the guidelines range *and* all relevant §3553(a) factors. As discussed *infra,* the District Court correctly determined the guidelines range after a review of the pre-sentencing investigation report and after ruling on Joyce's objections to that report. Then, the District Court turned to the §3553(a) factors. Before choosing a sentence of forty-six months, the District Court reviewed many letters of support submitted on Joyce's behalf, heard testimony from Joyce's family and Joyce himself, and considered the written and oral arguments made on his behalf.

We have previously held that a trial court need not discuss and make findings as to each §3553(a) factor if the record makes clear that it took all arguments and relevant factors

18

into account and gave them meaningful consideration during sentencing. *Unites States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006). The record reflects that the District Court took into account the parties' arguments and testimony concerning the §3553(a) factors, and considered the nature and circumstances of the offenses and the personal history and characteristics of the defendant, including Joyce's status as a judge, his background as a previously law-abiding veteran with a long career in public service, his devotion to his family, the social stigma he was suffering as a result of the prosecution, and the loss of his judicial career.[12] The District Court imposed a sentence of forty-six months after articulating its belief that such a sentence would adequately address the nature and circumstances of the offense in light of Joyce's history and background, and also address the need to avoid unwanted disparities in sentencing among defendants with similar records found guilty of similar crimes.[13] The District Court went on to say that the sentence reflects the seriousness of the offense, promotes respect for the law, and serves as a deterrent, while protecting the public from further crimes by Joyce.[14] We find that the District Court satisfied the requirements of §3553(a).

The factual findings outlined above also support the District Court's imposition of a sentence of forty-six months, rather than a sentence at another point in the guidelines range, and thus satisfy the requirements of §3553(c). We will not require the District Court to

---

[12] App. Vol. VI, 2565-2566.

[13] *Id.*

[14] *Id.*

19

reiterate its reasoning if the same facts and findings support the requirements of §3553(a) and §3553(c). Because the District Court did not abuse its discretion in imposing Joyce's sentence, we will affirm the sentence imposed by the District Court.

## **Conclusion**

For the foregoing reasons, we will affirm Joyce's conviction and sentence.